IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>GREGORY R. BOYD,<br><br>Defendant/Movant. | Cause No. CR 06-28-BLG-SPW<br>CV 17-33-BLG-SPW<br><br>ORDER DENYING § 2255 MOTION<br>AND GRANTING CERTIFICATE<br>OF APPEALABILITY |

On February 23, 2017, the Ninth Circuit Court of Appeals granted Defendant Gregory Boyd leave to file in this Court a second motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. The United States has filed an amended answer and Boyd a reply. The United States also clarified an issue in the record. *See* Order (Doc. 285); U.S. Resp. to Order (Doc. 288). The parties have worked together to identify exculpatory and impeaching information that was in the United States' possession at the time of Boyd's trial. The Court is prepared to rule.

At the time of trial in 2007, Boyd was 24 years old. A jury convicted him of a drug conspiracy and a firearms offense. Based on two prior convictions for drug offenses committed in Contra Costa County, California, in May and August 2002, Boyd was designated a career offender and sentenced to serve 420 months in

prison, to be followed by an eight-year term of supervised release. *See* Verdict (Doc. 110) at 1–3; Judgment (Doc. 133) at 2–3.

On December 20, 2016, Boyd received executive clemency. His prison sentence was commuted and expired on December 19, 2018. *See* Executive Grant of Clemency (Doc. 204) at 1. He is currently on supervised release. *See* Judgment on Revocation (Doc. 255) at 3–4.

Boyd asserts the United States failed to correct false trial testimony and failed to disclose material exculpatory or impeaching information about cooperating witnesses. *See* Mot. § 2255 (Doc. 208) at 7–8 ¶ 29; *see also Giglio v. United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963); *Napue v. Illinois*, 360 U.S. 269 (1959).

## I. Summary of Trial Testimony

On February 16, 2006, a grand jury indicted Boyd for the following offenses:

| Count 1 | possessing 48.7 grams of methamphetamine of 61% purity, or 29.7 grams of actual methamphetamine, with intent to distribute it, a violation of 21 U.S.C. § 841(a)(1); |
| --- | --- |
| Count 2 | possessing two firearms in furtherance of drug trafficking, a violation of 18 U.S.C. § 924(c)(1)(A); and |
| Count 3 | being a felon in possession of the same two firearms, a violation of 18 U.S.C. § 922(g)(1).[1] |

---

[1] The Court previously stated that Count 2 was predicated on one firearm and Count 3 on another. *See* Order (Doc. 251) at 1. The statement here is correct.

2

*See* Indictment (Doc. 1) at 1–3.  After hearing three days of testimony, the petit
jury convicted Boyd on all three counts.  *See* Verdict (Doc. 110) at 1–3.

The central issue at trial was whether Boyd knew what was in the trunk of
the blue Oldsmobile he was driving on July 25, 2005, when a police officer
stopped him for having no license plates and no temporary tag.

According to law enforcement officers' testimony, Boyd appeared nervous.
He told an officer he had made three trips to California in the past month, did not
have a job, and was on his way to the Department of Motor Vehicles to get plates
for the car.  Boyd retrieved from the back seat an expired temporary sticker listing
him as the owner of the car.  *See* 1 Trial Tr. (Doc. 141) at 78:1–4, 97:4–10, 98:16–
19, 99:9–11.

Boyd was arrested on an outstanding traffic warrant.  As one of the officers
drew out the contents of Boyd's pocket to retrieve the Oldsmobile's keys—two
loose keys—he discovered a baggie with marijuana in it.  *See id.* at 90:20–22,
100:13–19.  Boyd also had two cell phones in his pockets.  *See id.* at 130:5–25.

After Boyd arrived at jail, he began sweating profusely and shaking, with his
teeth chattering.  *See* 1 Trial Tr. at 133:6–10.  He was taken to the hospital.  A
nurse and a doctor heard him say he had used ecstasy and marijuana.  The nurse
said he also reported using methamphetamine.  *See* 2 Trial Tr. at 170:3–7, 171:6–
14, 179:1–2.  Boyd's pulse was rapid.  His pupils were not "markedly dilated or

enlarged, but they were large." His blood pressure was in the normal range, but he had received a medication at the jail to lower it. *See id.* at 176:8–177:25, 178:18–19. Toxicological analysis of Boyd's blood indicated the presence of amphetamines and cocaine, consistent with both or either methamphetamine or ecstasy. He experienced cardiopulmonary arrest. His symptoms were consistent with drug overdose or drug intoxication. *See id.* at 179:13–15, 181:13–22, 182:2–19.

Back at the scene of the traffic stop, a drug dog alerted on the trunk and the front passenger side of the vehicle, where Boyd's friend, Deandre Gulley, had been sitting. The dog did not alert on the driver's side. When officers later obtained and executed a search warrant, they found in the trunk of the car a scale and a shoe box. Inside the box were shoes, a plastic Foot Locker bag, and two handguns. The hammer of one of the handguns was cocked and magazines were inserted, but no bullets were loaded in either gun or found elsewhere in the vehicle. The scale had methamphetamine residue on it. Inside the Foot Locker bag were three cellophane wrappers containing a total of 48.7 grams of methamphetamine. At the time, a person selling that quantity of methamphetamine in Montana could make about $4,000. *See, e.g.,* 1 Trial Tr. (Doc. 141) at 84:14–17, 103:20–104:19, 107:18–108:15, 112:8–15, 120:7–19, 124:12–20; 2 Trial Tr. (Doc. 142) at 226:3–5, 226:9, 228:13–14, 246:4–7.

4

Forensic analysis identified one partial fingerprint of Boyd's on the Foot

Locker bag.  Several other usable prints were found on the bag and one on the

scale, but none of them belonged to Boyd.  Six prints on the bag were matched to a

person named Charles Taylor.  No usable prints were found on the cellophane

wrappers.  The firearms were not tested for prints.  Aside from the partial print on

the Foot Locker bag,[2] Boyd's prints were not identified on anything else in the

trunk.  *See* 2 Trial Tr. at 190:17–191:4, 194:24–195:3, 196:14–197:10, 199:3–7,

200:7–201:2, 211:23–25.

Boyd was released from the jail and the hospital on that occasion.  Four days

later, on July 29, 2005, he was arrested again on an outstanding warrant.  At that

time, he was driving a 1994 white Pontiac Bonneville with a temporary sticker,

expired that day, and listing John Taylor as the owner.  Boyd's passenger said his

name was John Taylor.  Officers identified him as Charles Taylor.  Boyd had in his

pocket a notebook containing entries consistent with a drug ledger, possibly

including two different persons' handwriting.  *See* 1 Trial Tr. at 146:22–149:8,

152:5–6, 155:12–15; 2 Trial Tr. at 259:9–264:9, 266:1–267:8.

Boyd testified at trial.  He explained that about a month before the two

traffic stops, on June 30, 2005, Charles Taylor wanted to buy the blue Oldsmobile

---

[2] Boyd said he bought a hat at the Foot Locker in Billings some time before his arrest. He was with Charles Taylor, who bought shoes, and he did not recall ever touching the bag. *See* 3 Trial Tr. (Doc. 143) at 419:18–420:16.

5

and had the money but no identification. Boyd had money, so he bought the car, put his name on the tag, and turned the vehicle over to Taylor. *See* 3 Trial Tr. (Doc. 143) at 390:18–391:13. Taylor's girlfriend testified that the car was Taylor's, that at some point he parked it in someone else's garage, and that he then drove a white Bonneville. *See id.* at 483:14–486:24.

Boyd also explained how he came to be driving the blue Oldsmobile on July 25, the day of the first traffic stop. His own car was a dark red Mitsubishi. His brother Fritz Anderson had a silver Monte Carlo. On July 25, both of those cars were inoperable. *See* 3 Trial Tr. at 394:1–396:10, 400:20–401:13. This fact was corroborated by evidence from tow truck drivers and body shop owners. Boyd could not find Taylor, but he knew where Taylor's blue Oldsmobile was. And since Boyd was the record owner, he was able to have keys made by the dealership. *See id.* at 403:10–404:11. This fact was corroborated by the dealership as well as the presence of the two loose keys in Boyd's pocket at the scene of the traffic stop.

All this evidence tended to show Boyd did not have access to the Oldsmobile's trunk for a significant period of time before the traffic stop, *see* 3 Trial Tr. at 408:14–410:21, reducing the probability that he surreptitiously put the drugs and guns there. On the other hand, the same evidence tended to show that Boyd was determined to obtain access to the blue Oldsmobile.

6

Boyd stood trial alone, but three cooperating witnesses testified that his brother, Fritz Anderson, supplied them with drugs and that Boyd was connected with Anderson's drug trafficking.[3] Cooperating Witness A said that he refused to give Boyd money A owed to Anderson when Boyd asked for it. Cooperating Witness B testified that, a week or two before the July 25 traffic stop, she heard Boyd, his friend Gulley, and others "bragging" that they had just returned from California with methamphetamine, cocaine, and ecstasy. This witness also said that she obtained methamphetamine from Lacee Jackson, Jackson told her its source was Fritz Anderson, and Witness B herself eventually obtained meth from Anderson. Cooperating Witness C testified that he owed Anderson $76,000 and gave it to Boyd while Anderson was temporarily in jail.

The United States describes these witnesses as playing a "small role as 'other acts' witnesses." Am. Answer (Doc. 264) at 3, 18. But the United States

---

[3] Cooperating Witness C began his testimony against Boyd somewhat badly:

Q.  You understand that your presence here today is for the purpose of several questions. Are you ready to testify?
A.  Yeah.
Q.  How far did you go in school?
A.  11th grade.
Q.  Do you know Fritz Anderson?
A.  Yes.
Q.  Who's Fritz Anderson?
A.  Right there [indicating].
Q.  Let me rephrase the question.
A.  Fritz Anderson is his brother, I'm sorry. That's Gregory Boyd.

2 Trial Tr. at 273:14–25. Anderson was indicted the day after the jury convicted Boyd and was arrested four days later.

usually has a good reason for calling witnesses, and these witnesses' roles were not small. Boyd's drug *use* was compellingly demonstrated by his hospitalization. The United States had no evidence he personally recorded drug-related information in the notebook, and Boyd said he did not, *see* 3 Trial Tr. at 425:6–21. The evidence was consistent with his merely being in possession of a car and notebook that someone used in connection with drug activity. Boyd defended himself on the grounds that he did not knowingly possess the guns and did not knowingly possess the drugs with the intent to distribute them. *See* 1 Trial Tr. (Doc. 141) at 71:21–72:9; 3 Trial Tr. (Doc. 143) at 541:11–24. The cooperating witnesses provided the evidence showing Boyd's knowledge and intent. *See* Fed. R. Evid. 404(b). Their testimony significantly strengthened the prosecution's case and increased the likelihood Boyd would be convicted.

## II. Analysis

### A. Legal Standard

Boyd's motion is his second under 28 U.S.C. § 2255. The Court of Appeals authorized its filing. *See* 9th Cir. Order (Doc. 208-3). Even after the appellate court authorizes filing, however, the district court must "dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements" for relief on a second or successive motion. 28 U.S.C. § 2244(b)(4).

8

The requirements for relief on a second motion are articulated in 28 U.S.C. § 2255(h)(1) and (2). This case does not concern a new constitutional rule, so only subsection (1) applies. Ordinarily, a defendant alleging that his trial was unfair because the United States withheld exculpatory or impeaching evidence would have to demonstrate a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *See Turner v. United States*, ___ U.S. ___, 137 S. Ct. 1885, 1893 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 470 (2009)). But, because Boyd's § 2255 motion is his second, he must show that his "newly discovered evidence, if proven and viewed in light of the evidence as a whole, would be sufficient to show by clear and convincing evidence that no reasonable factfinder would have found [him] guilty of the offense." 28 U.S.C. § 2255(h)(1); *cf. also id.* § 2244(b)(2)(B); *Brown v. Muniz*, 889 F.3d 661, 674 (9th Cir. 2018). This standard is far more difficult to meet.

## B. Newly Discovered Evidence

Boyd's claim arises because one of the two prosecutors at his trial, AUSA James Seykora, failed to disclose exculpatory and impeaching evidence in other cases tried in this District. The second prosecutor, Special Assistant United States Attorney Sheila Kolar, questioned all but one of the 14 other witnesses. All three cooperating witnesses were called and examined by Seykora.

9

## 1. The Claim Has Prima Facie Validity

The United States argues that Boyd does not show that Seykora "withheld any *promises* made to cooperating witnesses." Am. Answer (Doc. 264) at 5 ¶ B (emphasis added). Even so, that does not necessarily mean that he *disclosed all* exculpatory or impeaching information about them.

Ordinarily, the Court has confidence that prosecutors disclose what they are supposed to disclose. Experience has shown it cannot have confidence that Seykora did so. For example, after Boyd's trial, Seykora filed sentence-reduction motions under 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1 for the three cooperating witnesses whose testimony is at issue here. Seykora later called the same three witnesses to testify against Anderson. But he failed to tell Anderson's counsel he had filed § 5K1.1 motions for them. In fact, in Anderson's case, Seykora failed to disclose eight § 5K1.1 motions he personally filed before Anderson's trial for witnesses he personally called to testify at Anderson's trial. He failed to disclose an informal agreement not to prosecute four more witnesses, and he permitted yet another cooperating witness to misrepresent the scope of his immunity agreement.[4]

In a second case, Seykora permitted false testimony to stand uncorrected.[5]

---

[4] *See* Redacted Order (Doc. 506) at 4–18, *United States v. Anderson*, No. CR 07-15-BLG-SPW (D. Mont. Oct. 9, 2018).
[5] *See* Order (Doc. 746) at 5–11, *United States v. Garcia*, No. CR 04-87-BLG-RFC (D. Mont. Sept. 30, 2011).

10

In a third, he failed to disclose more § 5K1.1 motions, including the one he filed for the chief prosecution witness.[6]  In a fourth, he failed to disclose that federal agents had paid a witness $60 and she knew she stood to obtain more if she continued working as a confidential informant.  He also failed to disclose that the same witness, before trial, did *not* identify the defendant as the man who was at her apartment.  At trial, she testified under oath that the defendant *was* the man who was at her apartment.[7]  For these reasons, even if Boyd's counsel received summaries of one or two interviews of a witness, *see* Am. Answer at 11–12, that does not mean he received summaries of *all* the interviews with the witness or that none of the summaries contradicted each other.

Seykora's evident failure to keep a log of what he produced to defense counsel makes it very difficult for the United States to know, and habeas counsel to verify, whether he disclosed what he should have.  Hypothetically, if Seykora had paid rent and moving expenses for the three witnesses who testified against Boyd, he could have made all the same responses and disclosures in response to Boyd's motion to compel before trial.  *See* Am. Answer at 5–7.  No one would have been the wiser.  This example is not merely hypothetical.  In a fifth case, Seykora paid a

---

[6] *See* Order (Doc. 193) at 2–6, *United States v. Johnson*, No. CR 06-79-BLG-DLC (D. Mont. Dec. 1, 2014); *see also* U.S. Resp. to Order (Doc. 196), *Johnson*, No. CR 06-79-BLG (D. Mont. filed Jan. 9, 2015).

[7] *See* Order (Doc. 286) at 4–9, *United States v. Maldonado*, No. CR 02-91-BLG-SPW (D. Mont. May 29, 2020), *cert. of appealability granted*, No. 20-35482 (9th Cir. Oct. 29, 2020).

witness thousands of dollars in expenses, and he did not tell the defense.[8]

Finally, Seykora's "contemporaneous affirmative assertion . . . stating that all materials relating to the cooperation of witnesses [were] disclosed," Am. Answer at 14 (citing U.S. Resp. to Def. Mot. to Compel (Doc. 85) at 1), cuts little ice. He tacitly made the same assertion every time he concluded his direct examination of any cooperating witness at any trial, including the trials in *Anderson, Garcia, Johnson, Maldonado,* and *Ulloa.*

For all these reasons, the Court will assume that Seykora did not disclose anything unless independent evidence indicates he disclosed it.

## 2. What Was Not Disclosed

### a. Information about Lacee Jackson

Lacee Jackson did not testify at Boyd's trial, but the name "Lacee" appeared in the notebook taken from Boyd's pocket at the scene of the second traffic stop. An expert witness testified that numbers next to three names, including Lacee's, "look like amounts that they owe" for drugs. *See* 2 Trial Tr. at 262:8–12. And Cooperating Witness B, who said she obtained methamphetamine from Anderson some months after Boyd's arrest, also said she received methamphetamine from Lacee Jackson and that Jackson told her it came from Anderson.

---

[8] *See* Order (Doc. 771) at 6–7 & n.2, *United States v. Ulloa*, No. CR 99-04-BLG-SPW (D. Mont. Aug. 27, 2019).

Boyd argues that the prosecution might have had additional exculpatory or impeaching information about Lacee Jackson and, if so, should have disclosed it under Federal Rule of Evidence 806. *See* Boyd Reply (Doc. 284) at 2–10. He is speculating, but not implausibly. A memorandum dated June 10, 2008, acknowledged that the United States had agreed not to prosecute Jackson if she testified against others. *See* Ex. 12, U.S. Resp. to Order (Doc. 461-12), *Anderson*, No. CR 07-15-BLG-SPW (D. Mont. filed June 19, 2015). The agreement underlying the memorandum could have extended back to 2005 and could have involved more than an agreement to testify, such as work as a confidential informant.

But incentives later offered to Jackson[9] for testimony would have little bearing on what Witness B said Jackson said to her in the course of the conspiracy. And the jury already knew that both Jackson and Cooperating Witness B were drug users, with all the reliability issues that may entail. *See* Boyd Reply at 5–6.

In an abundance of caution, the Court will assume additional impeachment information about Jackson, other than her drug use and the prospect of a reduced sentence, was withheld and will consider it in the materiality analysis.

---

[9] Incentives offered to Witness B could have influenced what she said Lacee said to her. But the parties appear to agree that no incentives for B's testimony were withheld from Boyd at trial.

13

### b. Pretrial Interviews with Cooperating Witness B

The United States concedes that it cannot confirm that summaries of any of the cooperating witnesses' pretrial interviews ("302s") were produced to the defense. It is unlikely that *no* 302s were produced, because (then as now) the United States routinely produced them, and defense counsel would notice if none were produced. The record of the case also indicates 302s were produced as usual. *See, e.g.*, Mot. to Compel (Doc. 78, 79); Resp. (Doc. 85) (defense counsel sought agents' handwritten notes in addition to 302s).

But only the government knows how many interviews took place. As to Witness B, current counsel for the United States reports there were three pretrial interviews. Because there is no record of Seykora's disclosures, the Court will assume, for the sake of argument, that he produced only one of Witness B's 302s.

Even so, there is no need to decide which was produced and which were not. Little contradiction arises among Witness B's 302s or between the 302s and Witness B's trial testimony. Dates and quantities changed, but not in material ways. In her interviews, B said she began selling drugs after Christmas 2005, *see* Am. Answer Ex. 5 (Doc. 264-5) at 2 para. 6 (one ounce from Lacee); in January 2006, *see* Am. Answer Ex. 6 (Doc. 264-6) at 1 para. 3 (supplied by Biggs), 2 para. 4 (about two ounces from Lacee "in the past"); and in October 2005, *see* Am. Answer Ex. 7 (Doc. 264-7) at 1 para. 5 (total two ounces from Jackson in four or

14

five sales). All these dates are well after Boyd's arrest. At trial, Witness B agreed

she distributed drugs for "a few months" in 2005. *See* 2 Trial Tr. at 303:6–11.

Witness B was not asked and did not say when Lacee told her Anderson was

supplying the drugs. But even if that occurred well after July 2005, the name

"Lacee" was in the notebook when Boyd had it in his pocket. The question was

whether the Lacee mentioned in the notebook was Witness B's source, Lacee

Jackson. The prosecution wanted the jury to infer that it was.[10] Nothing in

Witness B's 302s undermines that suggestion. They lacked impeachment or

exculpatory value for Boyd.

### c. Pretrial Interviews with Cooperating Witnesses A and C

The only 302 produced by the United States with respect to Witness C

indicates that at least two interviews took place, an "initial debrief" on June 30,

2006, and one on July 12, 2006. *See* Am. Answer Ex. 11 (Doc. 264-11) at 1 paras.

1–2. The July 12 interview was transcribed in a 302 on August 10, 2006. No

record concerning the initial June 30 debrief exists. *See* U.S. Resp. to Order (Doc.

288) at 1–2. The Court will assume it would have been favorable to Boyd.

As to Witness A, on February 12, 2007, about a week before trial, Kolar

---

[10] Boyd questions whether Special AUSA Kolar was "representing that she does not know Lacee Jackson" in closing argument. *See* Boyd Reply (Doc. 284) at 3. The Court believes she was acknowledging the United States had not introduced evidence proving that the "Lacee" in the notebook was Lacee Jackson but encouraging the jury to draw that inference.

advised Boyd's counsel that she interviewed Witness A on December 12, 2006.

Kolar described a statement A reported hearing Boyd make, attributing the "dope"

in the blue Oldsmobile to Gulley, but she did not provide a summary of the

interview. *See* Kolar Letter (Doc. 264-1) at 34; U.S. Resp. to Order (Doc. 288) at

2. As the interview was conducted by Kolar, not Seykora, the Court has no cause

for concern that any additional exculpatory or impeaching information emerged

but was not disclosed to Boyd.

### d. Jail Phone Call Involving Witness C

Witness C's testimony differed significantly from that of Witness A and B

as to the amount of drugs he indicated Anderson, and to some degree Boyd, were

handling. Witness C told the jury he owed Anderson $76,000. The jury also heard

that the 48.7 grams of methamphetamine in the trunk of the Oldsmobile had a

street value of about $4,000. If the jury did the math, C's testimony indicated he

had sold over 925 grams of methamphetamine for Anderson.

Seykora did not disclose to Boyd's trial counsel a recorded jail phone call

between Cooperating Witness C and his girlfriend. *See* Gov't Ex. 6 (Doc. 461-6)

at 3–4, *Anderson*, No. CR 07-15-BLG-SPW (D. Mont. June 19, 2015). In that call,

on May 10, 2006, Witness C was trying to think of someone he could offer up to

the prosecution to get himself out of trouble. He wanted to think of someone at

least as heavily involved in drug trafficking as he was.

16

Boyd's name never came up.  Omission of Boyd's name was consistent with Witness C's trial testimony against Boyd.  He said only that Boyd collected Anderson's drug money from him on one occasion, when Anderson was temporarily jailed.

But, in the same phone call, Witness C also failed to mention Anderson, from whom he supposedly received "pounds" of methamphetamine and cocaine "every two or three weeks" for "a little under three years," as he claimed at Anderson's trial.  *See* 2 Trial Tr. (Doc. 337) at 271:23–272:2, *Anderson*, No. CR 07-15-BLG-SPW (D. Mont. Jan. 23, 2009).  Instead, Witness C's phone call focused on a third person, Nate Davis, a cousin of Anderson and Boyd.  No one at Boyd's trial connected him with Davis.  And Witness C's phone call also would have resonated with a defense investigator's trial testimony that Witness C failed to recognize Boyd when he saw him in jail.  *See* 3 Trial Tr. (Doc. 143) at 476:6–479:13.

In sum, the recorded phone call tended to undermine not only Witness C's credibility, because it demonstrated his desperation to save himself, but also the substance of what he said about Anderson and, therefore, what he said about Boyd. The phone call should have been disclosed to the defense but was not.

### e. Conclusion

The Court will presume the prosecution failed to disclose Witness C's phone

17

call, the report of Witness C's initial debrief on June 30, 2006, and information that would have undermined the credibility of Lacee Jackson's statement that she received methamphetamine from Anderson.

Boyd has not provided adequate reason to believe additional relevant undisclosed information could be located through discovery.

## C. Materiality

The next and final question is whether the undisclosed information about Witness C and Lacee Jackson, taken together and "viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [Boyd] guilty of the offense." 28 U.S.C. § 2255(h)(1).

The undisclosed information about Witness C paints him in an entirely different light. Few reasonable jurors would have believed what he said.

Boyd argues that undisclosed information about Jackson would be material because it might have allowed him to attack the credibility and even the admissibility of her reported statement that she received methamphetamine from Anderson. *See* Boyd Reply at 4. The prospect is unlikely[11]—too unlikely even to

---

[11] The fact that Boyd was not charged with conspiracy, *see* Reply at 8, is not relevant. *See, e.g., United States v. Merritt*, 945 F.3d 578, 586 n.5 (1st Cir. 2019); *see also United States v. Gonzalez*, 715 F.2d 1411, 1412–13 (9th Cir. 1983); *United States v. Williams*, 435 F.2d 642, 645 (9th Cir. 1970). *Gonzalez* and *Williams* both state that the prosecution must introduce "independent evidence of a conspiracy" before a coconspirator statement may be admitted. That

warrant giving Boyd an opportunity to conduct discovery to determine exactly
what information, if any, was actually withheld.

Jackson's statement to Witness B was admissible non-hearsay against Boyd
if Jackson was Boyd's coconspirator and if she made the statement "during and in
furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). This conspiracy
centered, according to all three cooperating witnesses, on Anderson. The
prosecution connected Boyd to Anderson (through the cooperating witnesses),
Boyd to "Lacee" (through the notebook), and Lacee Jackson to Anderson (through
Witness B's testimony). *See* 2 Trial Tr. at 303:19–304:4. The judge was free to
consider the content of Jackson's reported statement in deciding whether to admit
it. *See Bourjaily v. United States*, 83 U.S. 171, 176–81 (1987). Witness B's report
that Jackson said she obtained methamphetamine from Anderson added weight to
the inference that Lacee Jackson was the "Lacee" in the notebook, but the
inference could have been drawn anyway.

Most importantly, Jackson's reported statement, believed or disbelieved, was

---

requirement was abrogated by *Bourjaily v. United States*, 83 U.S. 171, 176–81 (1987), which
held that Federal Rule of Evidence 104(a) allows a court to consider the statement when deciding
whether a conspiracy existed, whether the declarant and defendant were part of it, and whether
the statement was made during and in furtherance of it.

Boyd also argues that application of the coconspirator hearsay exception turned on "a
remarkably short period of time that Jackson would have been selling for Anderson and [also]
could have known Boyd." Boyd Reply at 6. Jackson evidently began selling methamphetamine
for Anderson in the summer of 2005, and Boyd was arrested on July 29, 2005. But Boyd did not
have to know or deal with Jackson. She had only to be a member of the same conspiracy as
Boyd—a conspiracy centered on Anderson.

not significant evidence that Boyd participated in Anderson's drug trafficking. Even if the jury disbelieved Jackson's statement or the statement was not admitted at all, the jury still would have considered Boyd's connection to Anderson, Boyd's possession of a notebook listing "Lacee" as a drug debtor, Witness B's testimony that she obtained methamphetamine first from Lacee Jackson and then from Anderson. And of course the jury still would have considered all the other evidence, including Witness B's claim to have overheard Boyd and others bragging about bringing drugs up from California and Witness A's claim that Boyd asked him for drug money owed to Anderson.

Nor is there reason to believe that any undisclosed information would relate to or augment Boyd's testimony. Again, the central factual question at trial was whether Boyd knew what was in the trunk of the Oldsmobile. Boyd presented uncontroverted evidence corroborating his account of what happened on July 25, 2005. This corroborating evidence strongly tended to show he had little time to look in the trunk or put something in it. But a reasonable juror still could have inferred that Boyd did do so, or that someone told Boyd what was in the trunk, or that Boyd figured it out based on other things he knew.

Boyd was the only trial witness with direct, personal knowledge of whether he knew what was in the trunk. A reasonable juror could have believed he undermined his own credibility on several points. Boyd testified he had not seen

20

the car since Taylor bought it on June 30, but the United States introduced evidence that Boyd received a traffic ticket on July 2 while driving the car. *See* 3 Trial Tr. at 437:19–439:1. Boyd said he had never before been accused of possessing firearms, but the United States reminded him he was accused of it three years previously, in 2002. *See id.* at 446:14–448:4. Boyd denied saying he had been to California three times in July, *see id.* at 416:10–24, contrary to Officer Newsome's testimony; denied telling anyone at the hospital he had ingested methamphetamine, *see id.* at 442:8–24, contrary to the nurse's testimony; and admitted writing in the notebook on July 29 but denied it was in his pocket when he was arrested that day, *see id.* at 425:2–21, 450:24–451:14, contrary to Deputy Evans' testimony.

These discrepancies between Boyd's and other witnesses' testimony were not evidence that Boyd was guilty. A reasonable juror could have believed that Boyd told the truth or that he prevaricated simply due to the intense pressure produced by fear of conviction.

But other reasonable jurors, aware of undisclosed impeachment information about Cooperating Witness C and about Lacee Jackson as well as all of the other evidence introduced at trial, still could have found, beyond reasonable doubt, that Boyd was engaged in drug trafficking and knew the Oldsmobile contained drugs and firearms in the trunk.

21

The prospect that *no* reasonable juror would have convicted Boyd is neither clear nor convincing.  His second motion under 28 U.S.C. § 2255 must be denied.

### III.  Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2255 Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The Court of Appeals has already found that Boyd makes a *prima facie* showing that he meets the requirements of 28 U.S.C. § 2255(h)(1).  *See* 28 U.S.C. § 2244(b)(3)(C); 9th Cir. Order (Doc. 208-3).  There is some substance to his showing as well, since the United States did indeed fail to disclose some evidence that should have been disclosed.  "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail."  *Buck v. Davis*, __ U.S. __, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 338).  Despite the

extremely high standard requiring clear and convincing evidence that no reasonable juror would convict Boyd, the Court will grant a certificate of appealability.

Accordingly, IT IS ORDERED:

1. Boyd's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 208) is DENIED.

2. A certificate of appealability is GRANTED on the issue of whether Boyd meets the standard of 28 U.S.C. § 2255(h)(1). The Clerk of Court shall immediately process the appeal if Boyd files a Notice of Appeal.

3. The Clerk of Court shall ensure that all pending motions in this case and in CV 17-33-BLG-SPW are terminated and shall close the civil file by entering judgment in favor of the United States and against Boyd.

DATED this 22nd day of March, 2021.

Susan P. Watters
United States District Court

23